MICHAEL P. CANNEY *vs.* NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY.

Suffolk.    February 9, 1967. — July 13, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Contract,* What constitutes, Contract of employment. *Equity Pleading
and Practice,* Appeal, Waiver, Exceptions. *Waiver.*

The filing of a bill of exceptions by an appellant from the final decree in
a suit in equity did not constitute a waiver under G. L. c. 214, § 23, of
its right to appeal where the record did not show that it had both filed
requests for rulings of law during the trial and after trial had requested
the trial judge to take action thereon.    [159]

In a suit in equity by a former employee against a telephone company to
secure performance of an alleged oral contract entered into by the de-
fendant, following serious and permanent spinal injuries to the plaintiff
from a fall from a telephone pole during the course of his employment,
to give him "his full pay . . . as long as he lived, without regard to
his physical ability to do the work . . . [and to] pay all medical ex-
penses for said injuries as long as he lived," evidence reported and
findings by the trial judge required a conclusion that no such oral con-
tract was made between the parties, either on the day following the
plaintiff's admission to a hospital when his superintendent on a visit to
him, after the plaintiff had stated that he did not intend to sue the
defendant, explained his "rights" during the course of negotiations
seeking a signed statement from him waiving his right to sue, or on a
day about two weeks later, shortly after his return home, when other
superior employees visited the plaintiff and he signed a document
whereby he elected to accept benefits under the defendant's "Disability
Benefits" plan for employees and released the defendant from all claims
for his injury.    [164–165]

BILL IN EQUITY filed in the Superior Court on July 24,
1961.

The suit was heard by *Barron, J.*

*Leon F. Sargent (Raymond F. Burke* with him) for the
defendant.

*James M. Walsh (James F. Sullivan* with him) for the
plaintiff.

KIRK, J.    The plaintiff brought a bill in equity against
the New England Telephone and Telegraph Company (the
company) and the International Brotherhood of Telephone
Workers (the union) seeking specific performance of an

alleged oral contract to employ the plaintiff for life and to assume all of the plaintiff's medical expenses resulting from an injury received by him in the course of his employment. The bill was dismissed against the union. A final decree was entered on October 22, 1963, ordering the company to pay the plaintiff $85,530. The company appeals from the final decree.

1. We first dispose of a procedural issue raised by the plaintiff. During the course of the trial the judge admitted de bene considerable portions of the evidence offered by the plaintiff. At the close of the trial the company presented five motions to strike the evidence taken de bene. On October 4, 1963, four of these motions were allowed; one was denied. The company's exception to the denial was saved. On October 18, the judge made "final disposition of some objections . . . by counsel" to the judge's rulings on the company's motions to strike the de bene evidence. After the final decree had been entered, but before the company had appealed therefrom, the company filed a "claim of exceptions" to and an appeal from the judge's action of October 18. On November 8, 1963, the company appealed from the final decree. The company thereafter presented a bill of exceptions to the judge which was disallowed on September 23, 1964. A single justice of this court entered a decree on February 15, 1965, establishing the company's bill of exceptions.

The plaintiff contends that, under G. L. c. 214, § 23, the company has waived its right of appeal by filing its bill of exceptions. The statute is not applicable. The record does not show either that the company filed requests for rulings of law during the trial or that it requested the judge to take any action on rulings after trial. Both steps are prerequisite to the operation of the statute. The filing of the bill of exceptions did not constitute a waiver of the company's right of appeal.

2. We have before us all the evidence which was before the trial judge, together with a statutory report of material facts. Our duty is "to examine the evidence and to de-

Canney *v.* New England Telephone & Telegraph Co.

cide the case according to our own judgment, giving due weight to the findings of the trial judge which will not be reversed unless plainly wrong." *Cohen* v. *Santoianni*, 330 Mass. 187, 190–191.

The plaintiff was employed by the company in 1930. Shortly thereafter he was laid off. He was rehired by the company in 1936 as an installer and repairman assigned to the Dorchester district. In July, 1945, the company was not an insured under the Workmen's Compensation Act. It had in effect a "Plan for Employees' Pensions, Disability Benefits and Death Benefits." The plan was administered by a benefit committee, appointed by the company.

Section 5 of the benefit plan provided, in part: "(1) All employees of the Company . . . shall be qualified to receive payments under these Regulations on account of physical disability to work by reason of accidental injury . . . arising out of and in the course of employment by the Company. Such payments are hereinafter referred to as Accident Disability Benefits. (2) Accident Disability Benefits shall be as follows: (a) Total Disability — Full pay for any period of total disability during the first thirteen weeks of disability, and half pay for any period of total disability after the first thirteen weeks of disability. . . . (7) In case of accidental injury . . . the Company will pay for necessary surgical treatment . . . . At its discretion the [benefit] [c]ommittee may authorize payment of other expenses necessary for the proper care and treatment of the employee, during such period as the [c]ommittee may determine." Section 8 of the plan states: "(24) In case of accident resulting in injury . . . of an employee which entitles such employee . . . to benefits under these Regulations, he . . . may elect to accept such benefits or to prosecute such claims at law as he . . . may have against the Company. If election is made to accept the benefits, such election shall be in writing and shall release the Company from all claims and demands which the employee . . . may have against it, otherwise than under these Regulations, on account of such accident. . . . The right of the employee

to accident disability benefits under these Regulations shall lapse if election to accept such benefits, as above provided, is not made within sixty days after injury, or within such greater time as the Committee shall, by resolution duly entered on its records, fix for the making of such election.''

In July, 1945, the plaintiff's immediate superior was William Kneath, a maintenance foreman. Kneath's immediate superior was James Drohan, a supervising repair foreman. Drohan, in turn, reported directly to Benjamin Malatesta, the district plant superintendent. It was the rule of the company that all employees, in their dealings with the company, should ''go through the chain of command.''

On July 7, 1945, the plaintiff, in the course of his duties, climbed a telephone pole and, in removing a cover from a cable box, disturbed a hornets' nest within the box. The plaintiff fell while attempting to ward off the hornets as he descended from the pole. He was taken to a hospital where it was learned that he had received serious and permanent injuries to his spine. On the day following his admission, he was visited by Malatesta and Drohan. Drohan told the plaintiff that ''Malatesta was with him to explain things'' to the plaintiff. Malatesta told the plaintiff that he was there to explain the plaintiff's rights to him. He asked the plaintiff if he ''had any intention . . . of suing the Company or engaging counsel.'' The plaintiff said that he had no such intention. Malatesta then told the plaintiff that if he ''did not agree to waive his rights as far as the accident was concerned and sign the necessary papers, . . . he couldn't do a thing for him; that if . . . [the plaintiff] would waive his rights against the . . . [company] on account of the injuries sustained to him by the accident on July 7, 1945, he would be given his full pay as an installer and repairman . . . through all the future years as long as he lived, without regard to his physical ability to do the work of an installer-repairman;

and that the . . . [company] would pay all medical expenses for said injuries as long as he lived.''

The plaintiff was removed by ambulance on July 21, 1945, to his home. On July 25 he was visited by Drohan and Kneath, who made promises to him similar to those made by Malatesta. During the course of that visit the plaintiff, who had received no pay since his accident, signed the following printed document: ''IN CONSIDERATION of the compensation payable to me by the New England Telephone and Telegraph Company under its Plan for Employees' Pensions, Disability Benefits and Death Benefits, I elect, in accordance with the provisions contained in paragraph 24 of Section 8 of the Plan, to accept the benefits to which I am entitled under the Plan in lieu of and in release of any claims and demands which I might otherwise have against said Company on account of injuries sustained by me at Milton in the State of Massachusetts on 7-7-45.'' The document also contains the signatures of Kneath and Drohan and notations that it was received by the company's benefit department and its division plant personnel supervisor. Subsequently the plaintiff received checks from the company for sums which represented his weekly salary from the date of the accident until thirteen weeks after the accident. At the end of thirteen weeks, the plaintiff received checks for sums which represented only one half of his weekly salary.

On October 28, 1945, the plaintiff sent a letter to the company, ''Attention: Benefit Committee,'' complaining of the reduction in the amount of the checks he was receiving. The letter read, in part: ''Two weeks ago I was placed on half pay after thirteen weeks of full pay, which according to the strict interpretation of the Benefit booklet, is all I am entitled to. My contention is from a moral viewpoint, that a man injured while performing his work, would receive full salary until he is able to return to work. . . . I contacted the Medical Department, with the idea of trying to get back to work, so that I could receive my full salary. . . . According to my pamphlet entitled 'What Will the

BENEFIT PLAN do for *Me?*', page 5, paragraph *1* it states,
'The Benefit Committee has discretionary powers allowing
it, within limits and subject in certain cases to executive
officers' approval, to determine appropriate action in cases
that cannot be covered by specific rules for the many differ-
ent circumstances involved. In this way, flexibility is given
to the operation of the Plan.' I believe the above quota-
tion should apply in my case.'' The plaintiff testified that,
after the letter was sent, he received a telephone call from
Malatesta who told the plaintiff that he ''had no business
to write the letter''; that the plaintiff was ''a special case
and . . . came under him . . . and to go to him and he
would handle the case''; and that the plaintiff ''was going
over his head.'' As a result of the letter, the plaintiff
received $700 additional compensation from the benefit com-
mittee. He continued to receive half-pay until his return
to work.

The plaintiff returned to work in December, 1945. Be-
cause of his injuries, he was unable to work as an installer
and repairman. He was assigned to clerical work, but
received the higher salary due an installer and repairman.
As his condition improved, he was transferred to outside
light duty and, finally, resumed his former position as an
installer and repairman. He still suffered much pain from
his injuries, and was absent from work for considerable
periods of time. In January, 1954, he underwent an opera-
tion for the removal of a herniated disc due to his fall in
1945. He again returned to work on June 10, 1954, and was
assigned a clerical position with the company. He con-
tinued to be paid the higher rate of compensation due an
installer and repairman.

In November, 1959, the plaintiff was transferred to work
in the company's ''main frame work room.'' A dispute
arose over the plaintiff's physical ability to perform the
new assignment. The plaintiff was represented in the dis-
pute by the union. The union was unsuccessful in its at-
tempt to have the plaintiff transferred back to clerical
duties. As a result of the plaintiff's failure to perform

the work assigned in the main frame work room, he was suspended and later discharged. The present litigation followed.

The judge found that the union contract is not applicable to an employee in the special position held by the plaintiff. She found that an oral contract was entered into between the company and the plaintiff on or about July 25, 1945; that the signing of the release by the plaintiff constituted good and adequate consideration for the contract, and that the plaintiff signed the release relying upon the promises made by Malatesta on July 8, 1945, and the promises made by Drohan and Kneath on July 25, 1945, all of which the judge found were made on behalf of the company.

We examine the legal effect of the dealings between the parties. The question of what rights the plaintiff may have under the company's benefit plan is not before us. Our inquiry is limited to whether a contract was made between the parties on terms independent of the benefit plan. Where the existence of a contract is in issue, the burden is on the plaintiff to show it was made. *Breed* v. *Berenson,* 216 Mass. 397, 401. *Scott* v. *Dedham Water Co.* 224 Mass. 398, 399.

No contract was made between the parties during Malatesta's visit to the plaintiff on July 8, 1945. The plaintiff's testimony shows that his statement that he did not intend to sue the company was made before Malatesta explained his "rights" to him. There was no evidence of any statements by the plaintiff after Malatesta had explained his rights to him which indicated that the plaintiff had then made any agreement. In any event, the plaintiff's testimony and the judge's findings show that what Malatesta sought from the plaintiff was not his oral promise, but a signed statement, waiving his right to sue the company. No evidence was introduced to show that Malatesta sought to have the plaintiff sign the statement on July 8, or even that Malatesta had a copy of the statement with him upon his visit to the plaintiff. At best, therefore, the statements made by Malatesta on July 8, 1945, constituted only pre-

liminary negotiations, which were binding on no one. *Brighton Packing Co.* v. *Butchers' Slaughtering & Melting Assn.* 211 Mass. 398, 405. *Phoenix Spring Beverage Co.* v. *Harvard Brewing Co.* 312 Mass. 501, 505–506.

The binding contract must be found to have been made, if at all, on July 25, 1945. The judge found that an oral contract was made on that date. She found that the consideration given by the plaintiff in return for the company's promise of lifetime employment and assumption of medical expenses was the execution of the election agreement. The election agreement purports to set out in full the obligations of both parties, and to be binding upon them. The obligations of the company as stated in the election agreement are in direct conflict with the obligations of the company which the judge found existed under the oral contract. In such a case, the familiar rule applies that the earlier oral contract was superseded by and merged in the written contract. *Bergin* v. *Williams,* 138 Mass. 544. *Connelly* v. *Fellsway Motor Mart, Inc.* 270 Mass. 386, 390. *Marston* v. *Boston Publishing Co.* 271 Mass. 307, 313. *Whittier* v. *Goldberg,* 274 Mass. 335, 338. "The general rule is that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not." *Cohen* v. *Santoianni,* 330 Mass. 187, 193, and cases cited.

There were other findings by the judge that the plaintiff was in a weakened condition when he was requested to sign the election agreement, that he was hesitant to do so, and that he signed the agreement relying upon the promises made by Drohan, Kneath and Malatesta that he would be employed for life. The findings merely tend to show that there was no mutual consent and consequently no contract. The findings cannot be used to establish a contract whose terms are at variance with the plain language of the written election agreement.

Because we hold that no contract was ever entered into for the employment of the plaintiff on terms other than those stated in the election agreement, no question of

ratification of a lifetime employment contract by the company arises.

3.   The decree is reversed.   A decree is to be entered dismissing the bill.   The bill of exceptions is dismissed.

*So ordered.*